STATE OF NORTH CAROLINA, EX REL. HIS EXCELLENCY, JAMES B. HUNT, JR., GOVERNOR OF THE STATE OF NORTH CAROLINA; STATE OF NORTH CAROLINA, EX REL. THE HONORABLE JOHN R. INGRAM, COMMISSIONER OF INSURANCE OF THE STATE OF NORTH CAROLINA; AND STATE OF NORTH CAROLINA, EX REL. THE HONORABLE RUFUS L. EDMISTEN, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA v. NORTH CAROLINA REINSURANCE FACILITY, NORTH CAROLINA RATE BUREAU, ALLIANZ INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE INSURANCE COMPANY, AMERICAN AGRICULTURAL INSURANCE CO., AMERICAN AUTOMOBILE INS. CO., AMERICAN BANKERS INS. CO. OF FLA., AMERICAN CASUALTY CO. OF READING, AMERICAN DRUGGISTS' INS. CO., THE AETNA CASUALTY AND SURETY CO., THE AETNA FIRE UNDERWRITERS INS. CO., AETNA INS. CO., AFFILIATED F M INS. CO., AGRICULTURAL INSURANCE COMPANY, AIU INSURANCE COMPANY, ALLIANCE ASSURANCE CO., LIMITED, AMERICAN ECONOMY INSURANCE CO., AMERICAN EMPLOYERS' INS. CO., AMERICAN FIDELITY FIRE INS. CO., AMERICAN FIRE & CASUALTY CO., AMERICAN & FOREIGN INS. CO., AMERICAN GUARANTEE & LIABILITY INS. CO., AMERICAN HARDWARE MUTUAL INS. CO., AMERICAN HOME ASSURANCE COMPANY, AMERICAN INDEM— NITY COMPANY, AMERICAN INS. CO., AMERICAN MFGR'S MUTUAL INS. CO. ILL., AMERICAN MOTORISTS INSURANCE CO., AMERICAN MUTUAL FIRE INSURANCE CO., AMERICAN MUTUAL INS. CO. OF BOSTON, AMERICAN MUTUAL LIABILITY INS. CO., AMERICAN NATIONAL FIRE INS. CO., AMERICAN PROTECTION INSURANCE CO., AMERICAN RE-INSURANCE CO. OF DEL., AMERICAN SECURITY INS. CO., AMERICAN STATES INSURANCE COMPANY, AMERICAN UNIVERSAL INS. CO., AMICA MUTUAL INSURANCE COMPANY, ARGONAUT INS. CO., ASSOCIATED GENERAL INSURANCE CO.,

Hunt v. Reinsurance Facility

ASSOCIATED INDEMNITY CORP., ASSURANCE COMPANY OF AMER-
ICA, ATLANTIC INS. CO., ATLANTIC MUTUAL INS. CO., ATLAS
ASSURANCE COMPANY OF AMERICA, AUTOMOBILE CLUB INSUR-
ANCE COMPANY, AUTOMOBILE INS. CO. OF HARTFORD, BALBOA
INSURANCE COMPANY, BANKERS AND SHIPPERS INS. CO. OF NEW
YORK, BANKERS STANDARD INSURANCE CO., BELLEFONTE UN-
DERWRITERS INS. CO., BEACON INSURANCE COMPANY, BIRMING-
HAM FIRE INS. CO. OF PA., BITUMINOUS CASUALTY CORP., BITUM-
INOUS FIRE & MARINE INS. CO., BOSTON-OLD COLONY INS. CO.,
CALVERT FIRE INSURANCE COMPANY, CANAL INS. CO., CAROLINA
CASUALTY INS. CO., CARRIERS INS. CO., CAVALIER INS. CORP.,
CENTENNIAL INS. CO., CENTRAL MUTUAL INS. CO., CENTRAL
NAT'L INS. CO. OF OMAHA, CENTURY INDEMNITY CO., CHARTER
OAK FIRE INS. CO., CHICAGO INSURANCE COMPANY, CHURCH
MUTUAL INSURANCE COMPANY, CIMARRON INS. CO., INC., CIN-
CINNATI INSURANCE COMPANY, COLONIAL PENN FRANKLIN INS.
CO., COLONIAL PENN INSURANCE COMPANY, COMMERCE & INDUS-
TRY INS. CO., COMMERCIAL INS. CO. OF NEWARK, N.J., COMMER-
CIAL UNION INSURANCE CO., THE CONNECTICUT INDEMNITY CO.,
CONSOLIDATED AMERICAN INS. CO., CONTINENTAL CASUALTY
CO., CONTINENTAL INS. CO., CONTINENTAL REINSURANCE CORP.,
COTTON STATES MUTUAL INS. CO., COVINGTON MUTUAL INSUR-
ANCE COMPANY, CRITERION INSURANCE COMPANY, CUMIS IN-
SURANCE SOCIETY, INC., DRAKE INSURANCE COMPANY OF N.Y.,
ELECTRIC INSURANCE COMPANY, ELECTRIC MUTUAL LIABILITY
INS. CO., EMCASCO INSURANCE COMPANY, EMMCO INSURANCE
COMPANY, EMPIRE FIRE & MARINE INS. CO., EMPLOYERS CASU-
ALTY COMPANY, EMPLOYERS FIRE INS. CO., EMPLOYERS MUT-
UAL CASUALTY CO., EMPLOYERS MUTUAL LIABILITY INS. CO. OF
WIS., EMPLOYERS REINSURANCE CORP., EQUITABLE FIRE INSUR-
ANCE CO., EQUITABLE GENERAL INSURANCE CO., EXCALIBUR
INSURANCE COMPANY, FARMERS INS. EXCHANGE, FEDERAL IN-
SURANCE COMPANY, FEDERAL KEMPER INSURANCE COMPANY,
FEDERATED MUTUAL INSURANCE CO., FIDELITY & CASUALTY
CO. OF NEW YORK, FIDELITY AND GUARANTY INS. CO., FIDELITY &
GUARANTY INS. UNDERWRITERS, INC., FIREMAN'S FUND INSU-
RANCE COMPANY, FIREMEN'S INS. CO. OF NEWARK, N.J., FIRST
GENERAL INSURANCE COMPANY, FIRST OF GEORGIA INSURANCE
CO., FIRST NAT'L INS. CO. OF AMERICA, FOREMOST INS. CO. GRAND
RAPIDS, MICH., FORUM INSURANCE COMPANY, GENERAL ACCI-
DENT FIRE & LIFE ASSURANCE CORP., LTD., GENERAL INS. CO. OF
AMERICA, GENERAL REINSURANCE CORPORATION, THE GLENS
FALLS INSURANCE CO., GLOBE INDEMNITY CO., GOVERNMENT
EMPLOYEES INS. CO., GRAIN DEALERS MUTUAL INS. CO., GRANITE
STATE INS. CO., GREAT AMERICAN INSURANCE COMPANY, GREAT-
ER NEW YORK MUTUAL INS. CO., GREAT WEST CASUALTY COM-
PANY, GULF INSURANCE COMPANY, HANOVER INSURANCE COM-
PANY, N.H., HANSECO INSURANCE COMPANY, HARBOR INSUR-
ANCE COMPANY, HARCO NATIONAL INSURANCE COMPANY, HAR-
FORD MUTUAL INS. CO., HARLEYSVILLE MUTUAL INS. CO., HART-

Hunt v. Reinsurance Facility

FORD ACCIDENT & INDEMNITY CO., HARTFORD CASUALTY INSUR-
ANCE CO., HIGHLANDS INS. CO., HOLYOKE MUTUAL INS. CO. IN
SALEM, HOME INDEMNITY COMPANY, HOME INS. CO., INS. CO. OF
NORTH AMERICA, THE INSURANCE CO. OF THE STATE OF PENN-
SYLVANIA, INTEGON GENERAL INSURANCE CORP., INTEGON
INDEMNITY CORPORATION, INTEGRITY INSURANCE COMPANY,
INTERNATIONAL INSURANCE COMPANY, IOWA MUTUAL INS. CO.,
IOWA NAT'L MUTUAL INS. CO., HORACE MANN INSURANCE COM-
PANY, IDEAL MUTUAL INS. CO., INA REINSURANCE COMPANY,
INA UNDERWRITERS INSURANCE CO., INDEMNITY INS. CO. OF
NORTH AMERICA, INDIANA LUMBERMENS MUTUAL INS. CO., IN-
DUSTRIAL INDEMNITY CO., JEFFERSON INSURANCE COMPANY
OF N.Y., JEFFERSON PILOT FIRE & CAS. CO., JOHN DEERE INSUR-
ANCE COMPANY, KANSAS CITY FIRE & MARINE INS. CO., KEMPER
SECURITY INSURANCE CO., LIBERTY MUTUAL FIRE INS. CO., LIB-
ERTY MUTUAL INS. CO., LONDON GUARANTEE & ACC. CO. N.Y.,
LUMBERMENS UNDERWRITING ALLIANCE, LUMBERMENS MUT-
UAL CASUALTY CO., LUMBERMENS MUTUAL INS. CO., MARYLAND
CASUALTY CO., MASSACHUSETTS BAY INS. CO., MERCHANTS
MUTUAL INS. CO., METROPOLITAN PROPERTY AND LIABILITY INS.
CO., MICHIGAN MILLERS MUTUAL INS. CO., MICHIGAN MUTUAL
INSURANCE COMPANY, MIDDLESEX INSURANCE COMPANY, MID-
LAND INSURANCE COMPANY, MEAD REINSURANCE CORPORA-
TION, MIDWEST MUTUAL INS. CO., MILLERS NATIONAL INS. CO.,
MINNEHOMA INSURANCE COMPANY, MISSION INSURANCE COM-
PANY, MONARCH INS. CO., OF OHIO, MONTGOMERY MUTUAL IN-
SURANCE CO., MOTOR CLUB OF AMERICA INS. CO., MOTORS INS.
CORP., NATIONAL AM. INSURANCE CO. OF N.Y., NAT'L BEN FRANK-
LIN INS. CO. OF ILL., NATIONAL FIRE INS. CO. OF HARTFORD,
NATIONAL GENERAL INSURANCE COMPANY, NAT'L INDEMNITY
CO., NATIONAL INSURANCE UNDERWRITERS, NATIONAL SURETY
CORPORATION, NATIONAL UNION FIRE INSURANCE CO. OF PITTS-
BURGH, PA., NATIONWIDE MUTUAL FIRE INS. CO., NATIONWIDE
MUTUAL INSURANCE CO., NEWARK INS. CO., NEW HAMPSHIRE
INS. CO., NEW SOUTH INS. CO., NEW YORK UNDERWRITERS INS.
CO., NIAGARA FIRE INS. CO., NORTHBROOK PROPERTY AND CASU-
ALTY INSURANCE CO., N.C. FARM BUREAU MUTUAL INS. CO.,
NORTH RIVER INSURANCE COMPANY, NORTHERN ASSURANCE
CO. OF AMERICA, NORTHERN INS. CO. OF NEW YORK, NORTH-
WESTERN NAT'L CASUALTY CO., NORTHWESTERN NATIONAL INS.
CO., OCCIDENTAL FIRE & CAS. CO. OF N.C., OHIO CASUALTY INS. CO.,
OHIO FARMERS INSURANCE COMPANY, OLD GENERAL INSUR—
ANCE COMPANY, OLD REPUBLIC INS. CO., OMAHA INDEMNITY
COMPANY, PACIFIC EMPLOYERS INS. CO., PACIFIC INDEMNITY
COMPANY, PEERLESS INS. CO., PENINSULAR FIRE INSURANCE
COMPANY, PENNSYLVANIA MANUFACTURERS' ASSOCIATION IN—
SURANCE COMPANY, PENNSYLVANIA MILLERS MUT. INS. CO.,
PENNSYLVANIA NAT'L MUT. CASUALTY INS. CO., PETROLEUM
CASUALTY COMPANY, PHOENIX ASSURANCE CO. OF NEW YORK,
PHOENIX INSURANCE CO., PLANET INS. CO., POTOMAC INS. CO.,

PREFERRED INSURANCE COMPANY, PREMIER INSURANCE COM-
PANY, PROGRESSIVE CASUALTY INSURANCE COMPANY, PRO—
PRIETORS' INSURANCE COMPANY, PROTECTIVE INS. CO., PROVI-
DENCE WASHINGTON INS. CO., PRUDENTIAL PROPERTY AND
CASUALTY INSURANCE COMPANY, PUBLIC SERVICE MUTUAL
INS. CO., PURITAN INSURANCE COMPANY, RELIANCE INS. CO.,
ROYAL GLOBE INSURANCE COMPANY, ROYAL INDEMNITY CO.,
SAFECO INS. CO. OF AMERICA, SAFEGUARD INS. CO., ST. PAUL
FIRE & MARINE INS. CO., ST. PAUL GUARDIAN INSURANCE CO., ST.
PAUL MERCURY INS. CO., THE SEA INSURANCE COMPANY, LTD,
SECURITY INS. CO. OF HARTFORD, SECURITY MUTUAL CASUALTY
COMPANY, SELECT INSURANCE COMPANY, SENTRY INDEMNITY
COMPANY, SENTRY INSURANCE A MUTUAL CO., SHELBY MUTUAL
INSURANCE OF SHELBY, OHIO, SHIELD INSURANCE COMPANY,
SOUTH CAROLINA INS. CO., SOUTHERN FIRE & CASUALTY CO.,
TENN., SOUTHERN HOME INS. CO., STANDARD FIRE INS. CO.,
STANDARD GUARANTY INSURANCE CO., STATE AUTOMOBILE
MUTUAL INS. CO., STATE CAPITAL INS. CO., STATE FARM FIRE &
CASUALTY CO., STATE FARM MUTUAL AUTOMOBILE INS. CO., SUN
INSURANCE OFFICE, LTD., SUPERIOR INSURANCE COMPANY, SUB-
SCRIBERS AT CASUALTY RECIPROCAL EXCHANGE, TEACHERS
INSURANCE COMPANY, TOKIO MARINE AND FIRE INS. CO., LTD.,
TRANSAMERICA INSURANCE COMPANY, TRANSCONTINENTAL
INS. CO., TRANSIT CASUALTY COMPANY, TRANSPORT INDEMNITY
CO., TRANSPORT INS. CO., TRANSPORTATION INSURANCE COM-
PANY, TRAVELERS INDEMNITY CO., TRAVELERS INDEMNITY CO.
OF AM., TRAVELERS INDEMNITY CO. OF R.I., TRAVELERS INSUR-
ANCE CO., TWIN CITY FIRE INS. CO., TRUCK INS. EXCHANGE, UNI-
GARD INDEMINITY COMPANY, UNIGARD INSURANCE COMPANY,
UNIGARD MUTUAL INSURANCE CO., UNITED PACIFIC INSURANCE
COMPANY, UNITED STATES FIDELITY & GUARANTY, UNITED
STATES FIRE INS. CO., UNITED STATES LIABILITY INS. CO., UNI-
VERSAL UNDERWRITERS INS. CO., USAA CASUALTY INSURANCE
COMPANY, UNITED SERVICES AUTOMOBILE ASSN., UTICA MUTU-
AL INS. CO., VALIANT INSURANCE COMPANY, VALLEY FORGE
INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, VIRGIN-
IA MUTUAL INS. CO., VIRGINIA SURETY COMPANY, INC., WAUSAU
UNDERWRITERS INS. CO., WEST AMERICAN INSURANCE COM-
PANY, WESTCHESTER FIRE INS. CO., THE WESTERN CASUALTY &
SURETY CO., THE WESTERN FIRE INSURANCE CO., WESTFIELD
INS. CO., YOSEMITE INSURANCE COMPANY, ZURICH INSURANCE
COMPANY

No. 5

(Filed 4 March 1981)

Insurance § 79.1— automobile liability insurance — recoupment surcharges —
rates — no necessity for filing

Surcharges on automobile liability insurance coverages ceded to the N. C.
Reinsurance Facility to recoup past facility losses and on all automobile liability

coverages to recoup anticipated losses on ceded "clean risks" did not constitute rates and no filing with or approval by the Commissioner of Insurance was required by law with respect to the surcharges in question.

ON appeal as a matter of right pursuant to G.S. 7A-30(2) from and on discretionary review pursuant to G.S. 7A-31 of the decision of the Court of Appeals, 49 N.C. App. 206, 271 S.E. 2d 302 (1980), one judge dissenting, modifying in part and remanding the order of *Judge Braswell* entered 26 February 1980 in Superior Court, WAKE County.

The primary issue on this appeal is whether "recoupment surcharges" imposed on certain insureds by the North Carolina Reinsurance Facility are "rates" within the meaning of our insurance laws and therefore subject to the statutory requirement that rates must be filed with the Commissioner of Insurance.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Isham B. Hudson, Jr., and Hunter, Wharton & Howell, by V. Lane Wharton, Jr., for plaintiffs.*

*Allen, Steed & Allen, P.A., by Arch T. Allen III and Charles D. Case, for Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, New York Underwriters Insurance Company and Twin City Fire Insurance Company.*

*Bailey, Dixon, Wooten, McDonald & Fountain, by J. Ruffin Bailey and Gary Parsons, for American Automobile Insurance Company, American Insurance Company, Associated Indemnity Corporation, Fireman's Fund Insurance Company, and National Surety Corporation.*

*Broughton, Wilkins & Crampton, by J. Melville Broughton, Jr., and Charles P. Wilkins, for Nationwide Mutual Fire Insurance Company, Nationwide Mutual Insurance Company, and N.C. Farm Bureau Mutual Insurance Company.*

*Johnson, Patterson, Dilthey & Clay, by Grady S. Patterson, Jr., and D. James Jones, Jr., for American Fire and Casualty Company, Ohio Casualty Company, Utica Mutual Insurance Company, Virginia Mutual Insurance Company, Carolina Casualty Insurance Company, West American Insurance Company, and American Indemnity Company.*

*Jordan Law Offices, by John R. Jordan, Jr., and Robert R.*

*Price, for American Manufacturers Mutual Insurance Company, American Motorists Insurance Company, American Protection Insurance, Federal Kemper Insurance Company, Kemper Security Insurance Company, and Lumbermens Mutual Casualty Company.*

*Manning, Fulton & Skinner, by Howard E. Manning and John B. McMillan, for Allstate Indemnity Company, Allstate Insurance Company, Northbrook Fire and Casualty Company, State Farm Fire and Casualty Company, and State Farm Mutual Automobile Insurance Company.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by Henry A. Mitchell, Jr., and R. Marks Arnold, for Aetna Casualty and Surety Company, Automobile Insurance Company of Hartford, Bankers Standard Insurance Company, The Connecticut Indemnity Company, Horace Mann Insurance Company, Insurance Company of North America, INA Reinsurance Company, INA Underwriters Insurance Company, Indemnity Insurance Company of North America, Pacific Employers Insurance Company, Security Insurance Company of Hartford, Standard Fire Insurance Company and Teachers Insurance Company.*

*Young, Moore, Henderson & Alvis, by Charles H. Young, Jr., for North Carolina Reinsurance Facility, North Carolina Rate Bureau, Allianz Insurance Company, and all other answering defendant insurance companies.*

CARLTON, Justice.

We are once again presented with a serious conflict between the insurance industry and the North Carolina Commissioner of Insurance concerning the interpretation of certain insurance laws. In this action, the Commissioner is joined by the Governor and the Attorney General as plaintiffs. In light of our recent extensive treatment of this area, we find it unnecessary to present a historical background of North Carolina's insurance laws except as stated briefly and in limited context below. References will be made to the four cases decided by this Court on 15 July 1980 and they will be hereinafter referred to collectively as the 1980 Insurance Cases, and individually as follows: *State ex rel. Commissioner of Ins. v. Rate Bureau,* 300 N.C. 381, 269 S.E. 2d 547 (1980), as 1980 Insurance Case I; *State ex rel. Commissioner of Ins. v. Rate Bureau,* 300 N.C. 460, 269 S.E. 2d 538 (1980), as 1980 Insurance Case II; *State ex*

*rel. Commissioner of Ins. v. Rate Bureau,* 300 N.C. 474, 269 S.E. 2d 595 (1980), as 1980 Insurance Case III; *State ex rel. Commissioner of Ins. v. Rate Bureau,* 300 N.C. 485, 269 S.E. 2d 602 (1980), as 1980 Insurance Case IV.

## I.

### SUMMARY OF FACTS AND HOLDINGS OF THE LOWER COURTS

On 24 September 1979 plaintiffs, the Governor, the Commissioner of Insurance and the Attorney General, filed a complaint for declaratory relief and motion for preliminary injunction against the North Carolina Reinsurance Facility (Facility), the North Carolina Rate Bureau (Rate Bureau), and approximately 300 of their member companies. Plaintiffs challenged the legality of specific "recoupment surcharges" imposed by the industry on certain motor vehicle insurance policyholders in addition to regular insurance premiums. Plaintiffs alleged that the surcharges are unlawful on numerous grounds, primarily that they are "rates" which may not be lawfully charged until filed with and reviewed by the Commissioner of Insurance. Pending a final resolution of the case on its merits, plaintiffs sought to enjoin collection of the surcharges.[1]

The motion for preliminary injunction was heard by Judge Braswell at the 18 February 1980 Session of Superior Court, Wake County. In an order filed 26 February 1980 Judge Braswell denied plaintiffs' motion for preliminary injunction on the grounds (1) that the surcharges were lawful and proper and in compliance with G.S. 58-248.34(e), G.S. 58-248.33(*l*), G.S. 58-248.34(f) and other applicable provisions of the Facility's Plan of Operation, (2) that no filing with or approval by the Commissioner of Insurance is required by law with respect to the surcharges in question, (3) that plaintiffs failed to demonstrate probable cause to believe that they would be successful upon the ultimate determination of the case, (4) that neither the plaintiffs nor the using and consuming public would be irreparably damaged by collection of the recoupment surcharges during the pendency of the litigation, and (5) that there was a substantial likelihood that the Facility would in the near future be

unable to meet its obligations as they become due should collection of the recoupment surcharges be enjoined *pendente lite* and, instead, that the Facility and its member companies would suffer irreparable harm if a preliminary injunction was issued.

Plaintiffs appealed the trial court order to the North Carolina Court of Appeals. On 21 October 1980, the Court of Appeals, Judge Wells writing, modified and remanded. That court held that the trial court properly denied plaintiffs' motion to enjoin collection of the disputed surcharges *pendente lite*, but that the denial of plaintiffs' motion that defendants be required to file the disputed surcharges with the Commissioner of Insurance was erroneous. The Court of Appeals agreed with plaintiffs that defendants were required to file the surcharges so that they could be reviewed by the Commissioner, and, if appropriate, by the courts as required by G.S. 58-248.33(*l*) and G.S. 58-248.34(d). The court reasoned that if the surcharges were not so filed and reviewed, persons paying the surcharges would be "denied the protection of the laws, may not be able to recover any excessive charges paid by them and would therefore suffer irreparable loss should plaintiffs prevail on the merits."

Judge Hedrick dissented. In his opinion, the appeal should be dismissed since it was from the denial of a preliminary injunction and no substantial right of plaintiffs would be lost if the appeal was not determined before a final hearing on the merits.

Defendants gave notice of appeal to this Court. Since Judge Hedrick's dissent did not directly address the filing issue, defendants also simultaneously petitioned this Court for discretionary review which we allowed on 2 December 1980. Oral arguments were heard on 10 February 1981. We disagree with the holding of the Court of Appeals and reverse.

Other facts important to an understanding of our decision are noted below.

## II.

## *JURISDICTION AND EXTENT OF REVIEW*

We elect to address a single issue on this appeal: Whether surcharges are "rates" within the meaning of our insurance laws. Other issues were addressed by the Court of Appeals and others

have been presented to us by the briefs of the parties. We elect not to address any of them. We have accelerated our efforts to file this opinion in order that it might be promptly available to our legislators who, we understand, are presently considering legislation in this controversial area of our law. To address the peripheral issues would serve no positive purpose and would, as will later be demonstrated, produce no different result. Unquestionably, the above issue is at the core of the controversy and the other issues raised pale in comparison. It would serve little purpose for us to extensively discuss whether the Governor had standing to sue. Moreover, whether the appeal should be dismissed as interlocutory since it is from the denial of a preliminary injunction, as discussed in the Court of Appeals' dissent, is irrelevant in light of our election to answer the substantive question involved. We also will not address the Court of Appeals' treatment of our preliminary injunction laws. With respect to these, and all other issues noted by the Court of Appeals and the parties in brief, we express no opinion. Suffice it to say that pursuant to our supervisory and discretionary power we find the procedural context of the matter before us to be such that we can adequately deal with the substantive issue presented in a controversy which is obviously demanding of prompt resolution. It is an issue crucial to the people of North Carolina.

### III.

### SURCHARGES VIS-À-VIS RATES

### A.

In the *1980 Insurance Case I*, Section III, we held that evidence, in view of the entire record, was insufficient to support the Commissioner's findings and conclusions that the 10% rate differential between insureds ceded to the Facility and those remaining in the voluntary market was unfairly discriminatory. There, we also reviewed the statutes creating the Facility and discussed in detail what we understood to be the intent of our Legislature in creating this form of automobile insurance administration. We noted then the problems relating to recoupment surcharges and that the 1979 Legislature had enacted legislation requiring that "clean risks" in the Facility be charged no higher rate than those outside. We also noted that confusion would continue to surround this phase of automobile insurance regulation in North Carolina until such time as our General Assembly acted to clarify the law.

The present action, of course, was initiated prior to our decision in *1980 Insurance Case I* and we are, as anticipated, confronted with an issue resulting from further confusion over the interpretation to be given certain provisions within the same area of our insurance laws. In light of our extensive discussion of the Facility legislation contained in *1980 Insurance Case I*, discussed here are only those portions of the insurance statutes relevant to this controversy. We will also attempt to place those portions of our insurance law in appropriate historical perspective.

In 1973, the General Assembly created the Facility to replace the outmoded and largely unworkable Assigned Risk Plan. Essentially, the Facility is a pool of insurers which insures drivers who the insurers determine they do not want to individually insure. The Facility is a creation of North Carolina's Compulsory Automobile Liability Insurance Law. The pertinent provisions are codified in Article 25A, Chapter 58, of the General Statutes. G.S. § 58-248.26 to .40 (1975 Cum. Supp. 1979) [hereinafter referred to as "Facility Act"]. Under the Facility Act, all insurance companies which write motor vehicle insurance in North Carolina are required to be members of the Facility. They are required to issue motor vehicle insurance to any "eligible risk" as defined in G.S. 58-248.26(4) who applies for that coverage, if the coverage can be ceded to the Facility. G.S. 58-248.32(a) provides in part that no licensed agent of an insurer may refuse to accept any application from an eligible risk for such insurance and that the agent must immediately bind the coverage applied for if cession of the particular coverge and limits are permitted in the Facility. After writing such coverage, the company has the option of either retaining it as a part of its voluntary business or ceding it to the Facility. If the policy is ceded, the writing company pays to the Facility the net premium, less certain ceding and claims expense allowances, and the Facility is then liable on the particular policy. Should there be a loss under the policy, the ceding company settles the claim and is reimbursed by the Facility.

The Facility is structured by law to operate on a no profit-no loss basis, and the rates charged drivers ceded to the Facility must reflect this:

> All rates shall be on an actuarially sound basis and shall be calculated, insofar as is possible, to produce neither a profit nor a loss.... Rates shall not include any factor for

underwriting profit on Facility business, but shall provide an allowance for contingencies. There shall be a strong presumption that the rates and premiums for the business of the Facility are neither unreasonable nor excessive.

G.S. § 58-248.33(*l*) (Cum. Supp. 1979).

The 1977 General Assembly enacted significant amendments to the original 1973 legislation. The most significant was the establishment of the procedures designed to make the Facility self-sustaining. Under the 1977 statute, losses sustained by the Facility can be recouped pursuant to statutory procedures. G.S. 58-248.34 was amended to provide in part that:

(e) . . . .

The plan of operation [of the Facility] shall provide for, among other matters, . . . *the recoupment of losses sustained by the Facility, which losses may be recouped either through surcharging persons reinsured by the Facility or by equitable pro rata assessment of member companies* . . . .

G.S. § 58-248.34(e) (Cum. Supp. 1979) (emphasis added). The member companies, in turn, recoup any such loss by surcharging policyholders:

The plan of operation shall provide that every member shall, following payment of any *pro rata* assessment, *commence recoupment of that assessment by way of an identifiable surcharge on motor vehicle insurance policies issued by the member or through the Facility until the assessment has been recouped.* Such surcharge may be at a percentage of premium or dollar amount per policy adopted by the Board of Governors of the Facility. With the exception of the recoupment provided for in G.S. 58-248.33(*l*) and with the exception of the surcharge against persons reinsured by the Facility as provided for in G.S. 58-248.34(e), recoupment, if necessary, shall not be made based on loss or expense experience prior to July 1, 1979. If the amount collected during the period of surcharge exceeds assessments paid by the member to the Facility, the member shall pay over the excess to the Facility at a date specified by the Board of Governors. If

the amount collected during the period of surcharge is less than the assessment paid by the member to the Facility, the Facility shall pay the difference to the member. *The amount of recoupment shall not be considered or treated as premium for any purpose.*

G.S. § 58-248.34(f) (emphases added).

The Facility amended its plan of operation in 1977 to comply with the statutory provisions noted above. The amended plan of operation essentially tracked the statutory language. The amended plan of operation was submitted to the Commissioner of Insurance on 20 October 1977 and approved by him on 18 November 1977.

The 1979 Legislature also enacted significant amendments to the Facility Act which are pertinent to this controversy. G.S. 58-248.31 was amended by the addition of two subsections. One of these amendments provides that each company will provide the same type of service to ceded business that it provides for its voluntary market. G.S. § 58-248.31(b) (Cum. Supp. 1979). The records provided to agents and brokers must indicate that the business is ceded. *Id.* When an insurer cedes a policy to the Facility and the premium for policy is higher than the insurer would normally charge for the policy if retained by the insurer, the policyholder must be informed (1) that his policy is ceded, (2) that the coverages are written at the Facility rate, and the rate differential must be specified, (3) the reason or reasons for cession to the Facility, (4) that the specific reason or reasons for his cession to the Facility will be provided upon the written request of the policyholder to the insurer, and (5) that the policyholder may seek insurance through other insurers who may choose not to cede his policy. *Id.* Upon the written request of a person notified that his policy has been ceded to the Facility, the insurer ceding the policy must provide in writing to the insured the specific reason for the decision to cede. G.S. 58-248.31(c) (Cum. Supp. 1979).

The 1979 Legislature also significantly amended G.S. 58-248.33. As amended, the statute defined a clean risk as the owner

of a motor vehicle classified as a private passenger non-fleet motor vehicle . . . if the owner and the principal operator and each licensed operator in the owner's household have two years' driving experience and if

neither the owner nor any member of his household nor the principal operator had had any chargeable accident or any conviction for a moving traffic violation . . . during the three-year period immediately preceding the date of application for motor vehicle insurance . . . .

G.S. § 58-248.33(*l*) (Cum. Supp. 1979). That subsection was also significantly amended to provide, "*However, the rates made by or on behalf of the Facility with respect to 'clean risks' . . . shall not exceed the rates charged 'clean risks' who are not reinsured in the Facility.*" *Id.* (emphasis added). Moreover, the amended subsection also provided that "[*t*]*he difference between the actual rate charged and the actuarially sound and self-supporting rates for 'clean risks' reinsured in the Facility may be recouped in similar manner as assessments pursuant to G.S. 58-248.34(f).*" *Id.* (emphasis added).

The Facility suffered tremendous financial losses pursuant to the statutory scheme summarized above. During the first four years of the Facility's operation, rates for ceded business were identical to those for voluntary business. There was, at that time, no provision in the statutes permitting separate rates for those insured by the Facility. Undoubtedly because insureds ceded to the Facility generally presented a greater risk than those not ceded, rates charged the ceded risks were insufficient to cover the claims on those policies and great losses were incurred. The losses for the fiscal years ending 30 September 1974, 30 September 1975 and 30 September 1976 were $14,300,000; $22,000,000 and $25,800,000, respectively. Hence, from its inception through 30 September 1976 the net cumulative operating loss of the Facility exceeded $62,000,000.

This trend of substantial losses was not reversed by the enactment of the 1977 amendments noted above. During the fiscal year ending 30 September 1978 the Facility sustained a net operating loss of $31.4 million, bringing its five-year losses from inception to over $109 million.[2] Therefore, in accordance with G.S. 58-248.34(e) and the plan of operation which had been approved by the Commissioner, the Facility Board of Governors voted, on 25 July 1979, to recoup the $31.4 million loss incurred in fiscal 1978 through an 18.6% recoupment surcharge *on motor vehicle insurance policies written and ceded to the Facility* during the period 1 December 1979

---

[2] Losses for fiscal year ending 30 September 1977 were $15,600,000.

through 30 November 1980.

At the same meeting, the Board of Governors also voted to implement a separate recoupment pursuant to the 1979 change in G.S. 58-248.33(*l*), discussed above. That amendment provided essentially that rates charged "clean risks" in the Facility cannot exceed rates charged those in the voluntary market and further provided that the resulting loss to the Facility could be recouped in a similar manner as assessments pursuant to G.S. 248.34(f). Prior to this amendment, there was no requirement that rates charged "clean risks" in the Facility be the same as rates charged in the voluntary market. Since the new "clean risk" subclassification within the Facility went into effect on 1 October 1979, a serious reduction in the amount of premium income collected by the Facility resulted. The Board of Governors therefore voted to recoup the reduction in income through a 1.1% surcharge on private passenger non-fleet policies, *both those ceded to the Facility and those issued in the voluntary market.*

Following the action of the Board of Governors on 25 July 1979, plaintiffs initiated this action in the Superior Court, Wake County, on 24 September 1979 and the case is before us in the procedural context discussed above.

B.

The primary issue presented by this appeal is whether the Court of Appeals erred in holding that recoupment surcharges are "rates" which must be filed with the Commissioner of Insurance.

G.S. 58-248.33(*l*), in pertinent part, provides: "The ... *rates* ... used on motor vehicle insurance policies reinsured by the Facility may be made by the Facility or by any licensed or statutory rating organization or bureau on its behalf and *shall be filed with the Commissioner.*" (Emphases added.) Plaintiffs vigorously contend that, while no specific statute so provides, the spirit of North Carolina's insurance laws requires that recoupment surcharges be included within the meaning of "rates" for the purpose of the above-stated filing requirement. We disagree for the reasons stated below.

Plaintiffs are unable to cite any specific statutory or other authority squarely in support of their position. Since our research has also failed to produce any such authority, the issue here pre-

sented is purely one of construing the intent of our Legislature. As always, our primary task in statutory construction is to ensure that the purpose of the Legislature in enacting the law, the legislative intent, is accomplished. *In re Dillingham*, 257 N.C. 684, 127 S.E. 2d 584 (1962). The best indicia of that legislative purpose are "the language of the statute, the spirit of the act, and what the act seeks to accomplish." *Stevenson v. City of Durham*, 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972). In addition, a court may consider "circumstances surrounding [the statute's] adoption which throw light upon the evils sought to be remedied." *State ex rel. North Carolina Milk Comm. v. National Food Stores, Inc.*, 270 N.C. 323, 332, 154 S.E. 2d 548, 555 (1967). Moreover, we must be guided by the rules of construction that statutes *in pari materia*, and all parts thereof, should be construed together and compared with each other. *Redevelopment Comm. v. Security Nat'l Bank*, 252 N.C. 595, 114 S.E. 2d 688 (1960). Such statutes should be reconciled with each other when possible and any irreconcilable ambiguity should be resolved in a manner which most fully effectuates the true legislative intent. *Duncan v. Carpenter & Phillips*, 233 N.C. 422, 64 S.E. 2d 410 (1951), *overruled on other grounds, Taylor v. J.P. Stevens & Co.*, 300 N.C. 94, 265 S.E. 2d 144 (1980).

Applying the foregoing rules of statutory construction, we first note the critical statutes authorizing the recoupment surcharges here in question. G.S. 58-248.34(e) requires the recoupment of losses sustained by the Facility "either through surcharging persons reinsured by the Facility or by equitable *pro rata* assessment of member companies." G.S. § 58-248.34(e) (Cum. Supp. 1979). If losses are recouped by surcharging the member companies, those insurers "shall . . . commence *recoupment of that assessment by way of an identifiable surcharge on motor vehicle insurance policies issued by the member or through the Facility until the assessment has been recouped. . . . The amount of recoupment shall not be considered or treated as premium for any purpose.*" G.S. § 58.248.34(f) (Cum. Supp. 1979) (emphasis added).

The foregoing statutes provide the specific authority for the imposition of the 18.6% surcharge here in question. With respect to the 1.1% surcharge, G.S. 58-248.33(*l*) provides that *rates* charged "clean risks" in the Facility cannot exceed *rates* charged "clean risks" in the voluntary market, but that "[t]he difference between the actual rate charged and the actuarially sound and self-

Hunt v. Reinsurance Facility

supporting rate for 'clean risks' reinsured in the Facility may be recouped in similar manner as assessments pursuant to G.S. 58-248.34(f)." G.S. § 58-248.33(*l*). Thus, the method of recoupment of this difference in rates is the same as that for the Facility's losses and is set out above.

Viewing these statutes and others noted below as components of a single and harmonious scheme, we think it obvious that the Legislature intended the "rates" to have a single and consistent meaning throughout and that "rates" does not encompass within its definition, for any purpose, including filing and review, the types of surcharges challenged here. In holding to the contrary, the Court of Appeals erred. We reach this conclusion for the following additional reasons:

(1) In reviewing the language of the 1977 amendments to our automobile insurance laws, all of which were enacted as House Bill 658, it is patently clear that our Legislature had no intention of equating recoupment surcharges with rates. To the contrary, it specifically provided that "[t]he amount of recoupment shall not be considered or treated as premium *for any purpose*." G.S. § 58-248.34(f) (emphasis added). Throughout those portions of Chapter 58 which were enacted or amended by the same legislation, the terms "rate" and "premium" are used interchangeably. For example, G.S. 58-124.22 provides in essence that when a "rate" has been disapproved by the Commissioner the "rate" may be used pending judicial review if the purported improper portion of the "premium" collected is placed in escrow. Law of June 30, 1977, 1977 N.C. Sess. Laws 1119, Ch. 828, s. 6 (enacted as G.S. § 58-130). G.S. 58-131.42(b) (Cum. Supp. 1979) also provides for "file and use" of a disputed rate for miscellaneous lines of insurance. G.S. 58-131.37 (Cum Supp. 1979) provides in essence that "rates" are not unfairly discriminatory because different "premiums" result for policyholders who have like exposures but different expense factors or who have like expense factors but different loss exposures.

The statutory interchangeable use of "rates" and "premiums" was carried forward into the 1979 Session. G.S. 58-248.31(b)(Cum. Supp. 1979) provides that if an insured pays a higher "premium" by virtue of having his policy ceded to the Facility, he must be notified that his coverage has been written at the Facility "rate" and must be further notified as to the amount of the "rate" differential.

G.S. 58-124.19, also enacted as part of House Bill 658[3] which effected the 1977 amendments referred to above, enumerates factors to be considered in establishing "rates." Those factors include, *inter alia*, actual loss and expense experience within the state for the most recent three-year period; prospective loss and expense experience; the hazards of conflagration and catastrophe; a reasonable margin for underwriting profit and for contingencies; past and prospective expenses specially applicable to this state; other relevant factors within the state; and countrywide experience only where credible North Carolina experience is not available. Clearly, these factors enumerated by our Legislature for consideration in ratemaking do not apply and are irrelevant to the calculation of surcharges such as those here in question. The Court of Appeals appears to have ignored the interchangeable usage of the words "rates" and "premium" and has failed to heed the express provision in G.S. 58-248.34(f) that recoupment shall not be considered or treated as premium for any purpose. The interchangeable usage of the words "rate" and "premium" becomes especially important when it is considered that the words "surcharge," "assessment" and "recoupment" are nowhere used in the filing and review provisions of our insurance law, G.S. 58-124.20, .21(b), .22(b) (Cum. Supp. 1979).

We find no basis from our review of the applicable insurance statutes to support plaintiffs' position that our Legislature intended to encompass recoupment surcharges within the meaning of "rates" and therefore conclude that there exists no legally defensible basis for the Court of Appeals' conclusion that recoupment surcharges, as rates, are subject to the filing and review portions of our insurance laws. To the contrary, our review of the applicable statutes compels the conclusion that the Legislature, in omitting surcharges from the file and review portions of our statutes, evidenced the clear intent *to exclude* surcharges from the filing and review requirements. "Where a statute sets forth one method for accomplishing a certain objective, or sets forth the instances of its application or coverage, other methods or coverage are necessarily excluded under the maxim *expressio unius est exclusio alterius.*" 12 Strong's N.C. Index 3d, Statutes § 5.10 (1978); *accord In re Bluebird Taxi Co.*, 237 N.C. 373, 376, 75 S.E. 2d 156, 159 (1953).

---

[3] Law of June 30, 1977, 1977 N.C. Sess. Laws 1119, Ch. 828.

(2) Review of past decisions of this Court and other authorities leads us to conclude that the Court of Appeals misunderstood the well-established definitions of "rates," "premiums," and "surcharges." "Rates" and "premiums" are usually defined similarly and in no instance do we find any hint which indicates that either "rates" or "premiums" encompasses "surcharges" within its definition:

> The *rate* is the price per unit of exposure that is charged a particular insured for a particular contract of insurance . . . . For the great majority of insureds, the product of the rate times the number of units of exposure equals the *premium* — the total price paid for the insurance.

C. Kulp & J. Hall, *Casualty Insurance* 765 (4th ed. 1968) (emphases in original). "Rate" has also been defined as "the amount of *premium* per unit of insurance or exposure." *Webster's Third New International Dictionary* 1884 (1971) (emphasis added).

This Court has stated: "For ratemaking purposes, the components of a casualty insurance premium are the 'pure premium' and 'expense loading.' The 'pure premium' is the amount allocated for the settlement of casualty losses, including loss adjustment expenses. 'Expense loading' is the amount allocated for operating expenses and for underwriting profit and contingencies." *In re Filing by Automobile Rate Administrative Office*, 278 N.C. 302, 312, 180 S.E. 2d 155, 162-63 (1971), quoting *Virginia State AFL-CIO v. Commonwealth*, 209 Va. 776, 777 167 S.E. 2d 322, 323 (1969).

This Court has noted on numerous occasions that ratemaking is a prospective process while surcharge assessments involve recoupment for losses already incurred. As Justice Exum aptly stated in *State ex rel. Commissioner of Ins. v. Automobile Rate Office*, 294 N.C. 60, 241 S.E. 2d 324 (1978), "rates are made prospectively, not retroactively . . . . '[T]he entire procedure [of ratemaking] contemplates a looking to the future.'" *Id.* at 71, 241 S.E. 2d at 331, quoting *In re Filing of Fire Ins. Rating Bureau*, 275 N.C. 15, 32, 165 S.E. 2d 207, 219 (1969). In *State ex rel. Commissioner of Ins. v. Automobile Rate Admin. Office*, 287 N.C. 192, 205, 214 S.E. 2d 98, 106 (1975), we described ratemaking as "an attempt to predict the future." We have said on numerous occasions that the purpose of the ratemaking process is to ensure that premiums are adequate to cover *anticipated* losses and *anticipated* expenses and to allow a

reasonable profit. *In re Filing by Fire Insurance Rating Bureau*, 275 N.C. at 39, 40, 165 S.E. 2d at 224.

Inclusions of recoupment surcharges within the meaning of "rates" simply does not comport with the established understanding of the meaning of that term. The surcharges imposed pursuant to the Facility Act are, generally speaking, retroactive: they are designed to recoup actual losses, those which have already been incurred. The 18.6% surcharge involves recovery of losses known and verified by audit conducted by independent auditors, as required by G.S. 58-248.34(h). While the 1.1% surcharge does involve recovery, to some extent, of a loss which has not been incurred, and which, because of its very nature, requires a prediction of future events, it, too, can be determined by simple mathematical computation. Moreover, in the case of the 1.1% surcharge, the statute specifically provides for recoupment of losses sustained by the Facility as a result of the legislation prohibiting increased rates for "clean risks" within the Facility over those in the voluntary market and specifically provides that "[t]he difference between the actual rate charged and the actuarially sound and self-supporting rates for 'clean risks' reinsured in the Facility may be recouped *in similar manner* as assessments pursuant to G.S. 58-248.34(f)." G.S. § 58-248.33(*l*) (emphasis added). In other words, the calculation of recoupment surcharges is essentially mathematical in nature. It looks into the past rather than the future. It is concerned with losses and expenses already incurred rather than those anticipated. Moreover, there is undisputed evidence in the record that the word "rate," as used in the industry, does not include the retroactive recovery of past losses involved in the statutory surcharging process. While the 1.1% surcharge does, to some extent, involve an estimation as to *future* losses, such recoupment is expressly authorized by the statute and in a manner which indicates that the recoupment is not to be considered as a "rate."

(3) Our conclusion that a recoupment surcharge is not a rate is further buttressed by reference to other portions of the statutory scheme. As stated above in section III B, if, as plaintiffs contend, the contested surcharges are rates for purposes of the filing and review requirements, then they must also be rates for all other purposes of our automobile insurance laws, for statutes *in pari materia* must be construed harmoniously. When the definition of rates is expanded to include surcharges and that definition is applied to other statu-

tory provisions dealing with rates, it becomes obvious that "rates" does not include surcharges.

For example, G.S. 58-124.19 enumerates factors which may properly be considered in establishing "rates." All factors listed indicate that, while past loss experience may be considered, it is relevant only to the extent of predicting future events. *See State ex rel. Commissioner of Ins. v. North Carolina Fire Ins. Rating Bureau*, 292 N.C. 471, 234 S.E. 2d 720 (1977). There is nothing in this statute which indicates that past losses themselves constitute a component of the rate, nor can such a conclusion be logically inferred. Such a crucial omission from the factors which may be considered in establishing rates is, we think, persuasive.

Another statute which demonstrates that the Legislature did not intend rates to include surcharges is G.S. 58-124.26. That statute places a 6% cap on annual insurance rate increases and was enacted[4] at a time when automobile insurance premiums were increasing rapidly. In the same bill, the Legislature indicated that the Facility was to operate on a no profit-no loss basis.[5] To this end, the Facility was to be permitted to recoup its losses. That a tremendous increase in revenues was necessary for the Facility to break even is obvious from the record. In its first filing after the 1977 amendments, the Facility demonstrated that a rate increase of 63.4% was required. We cannot believe that the Legislature would have expressed its intention that the Facility operate on a break-even basis and provided an apparent means for the Facility to do so and, in the same breath, made such a result impossible to achieve with the 6% cap. Instead, we find it infinitely more logical to presume that the Legislature acted in accordance with reason and common sense and did not act to produce an unjust and absurd result, *King v. Baldwin*, 276 N.C. 316, 172 S.E. 2d 12 (1970).

(4) We also note that the General Assembly is not unaware of the proper procedure for requiring that recoupment surcharges be filed with the Commissioner. Article 18B, Chapter 58, N.C. General Statutes, provides for recoupment surcharges for urban property

---

[4] Law of June 30, 1977, 1977 N.C. Sess. Laws 1119, Ch. 828, s. 6 (enacted as G.S. § 58-131.4).

[5] *Id.*

reinsurance. G.S. 58-173.28 specifically requires that such surcharges be approved by the Commissioner. That statute was enacted prior to the 1977 legislation here in question. Failure of the Legislature to incorporate provisions similar to those in Article 18B into the Reinsurance Act further compels the conclusion that the Legislature did not intend surcharges to be rates which must be filed with the Commissioner.

(5) We noted in our *1980 Insurance Case I* that one of the primary purposes of the 1977 legislation was to ensure that the Facility would be self-sustaining. Clearly, therefore, the Legislature contemplated that recoupment surcharges would be an indispensible means of funding the operation of the Facility. This is so because our Legislature also specifically provided that Facility *rates* would be established on a no profit-no loss basis insofar as possible. G.S. § 58-248.33(*l*). However, Facility rates are subject to the statutory cap on rates and cannot be increased by more than 6% annually. The record clearly discloses that collection of premiums pursuant to established rates does not support the Facility. At the time of the hearing before the trial court the Facility had approximately $13.6 million available for payment of claims and was experiencing a net cash outflow of approximately $3 million per month. Without recoupment surcharges, the Facility would have exhausted its assets and been unable to pay claims beginning in May 1980. In light of this serious inadequacy of Facility rates, any "rate" increases would clearly not cover the burgeoning Facility losses. Hence, we think our Legislature reasoned, other losses must be recovered through collection of recoupment surcharges. As stated above, however, we find nothing in the statutes which indicates that the Legislature intended to equate the recoupment surcharges with rates. To the contrary, the Legislature's concern that the Facility operate on a no profit-no loss basis, together with the statutory cap on rates impels us to conclude that the Legislature intended the recoupment surcharges to be separate and apart from rates.

(6) Finally, we respond to the Court of Appeals' reasoning that if recoupment surcharges are not considered rates, then the persons paying such surcharges "would be denied the protection of the laws." Again, construing the applicable statutes, we find no support for such reasoning. The Legislature clearly structured the statutory scheme to provide for public protection against surcharges of an amount greater than actual losses by requiring that the Facility

---

Hunt v. Reinsurance Facility

---

be operated on a no profit basis. As we understand the statutory scheme, any excess of surcharges over losses would be reflected in the operating results of the Facility for the period during which the surcharge was collected. This would reduce the Facility's operating loss for the period of collection and therefore reduce the loss which the Facility may recoup by the surcharges. Put another way, the only result of excessive surcharges in one period would be a corresponding offset in the surcharge for the following period. We see no way, under the statutory scheme, for the Facility or its member companies to profit by excessive surcharges. Moreover, we note that, with respect to this portion of our insurance laws, the Commissioner received statutory sanction for independent audits of the Facility's annual statements — a device he vigorously contended he needed with respect to other portions of the insurance statutes in the *1980 Insurance Cases.* Such audits, we think, provide public protection against excessive surcharges by independent verification of the recoupment surcharges imposed.

(7) We find especially pertinent, in considering the intent of our Legislature, this statement to the 1979 General Assembly commenting on the 1977 insurance law amendments:

> Under the old law the participating companies could not transfer more than 50% of their risks to the Facility, had to share Facility losses, and could not charge higher rates for automobile liability policies ceded to the Facility. House Bill 658 [, 1977 revision of insurance law,] changed all of that by eliminating the 50% limitation on cessions, by permitting higher rates or surcharges to recover losses of the Facility, and by providing for distribution of Facility gains to policy-holders reinsured by the Facility. *The apparent intent behind the new provisions is to make the Facility self-sustaining,* whereas under the old system the insurance industry in effect subsidized the Facility by absorbing its losses.

North Carolina Legislative Research Commission, *Report to the 1979 General Assembly of North Carolina, Insurance Laws,* at 12-13 (1979) (emphasis added).

Again, we find no hint of any intention that surcharges be used for anything other than recoupment of past losses nor that they be treated as rates for the purpose of the statutes requiring filing and

review of rates.

In summary, our review of the statutory scheme enacted by our Legislature reveals no legislative intent that recoupment surcharges be considered rates and be subject to the filing and review requirements before the Commissioner of Insurance. Plaintiffs have cited us to no specific authority in support of their contention in this respect nor has our research disclosed any. Likewise, the decision of the Court of Appeals is without citation of authority and our review of the record discloses that its reasoning is unsupportable. We must, therefore, reverse the Court of Appeals and reinstate the order of the trial court.

## IV.

### *SUMMARY AND CONCLUSION*

In an insurance case before this Court in 1977, Justice Lake, writing for the Court, stated:

> We observe that both the Commissioner and the Bureau are enmeshed in a statutory plan for rate-making so ambiguous and unclear that legislative revision appears to offer more likelihood of future harmony between the Commissioner and the Bureau, in their efforts to bring about a realization of the dual legislative purpose of insurance at a reasonable cost in financially responsible companies, than does piecemeal construction of the statutes through what is not rapidly assuming the proportions of an interminable series of judicial reviews of orders by the Commissioner.

*State ex rel. Commissioner of Insurance v. Rating Bureau,* 292 N.C. at 490, 234 S.E. 2d at 730.

Unfortunately, this piecemeal construction of our insurance statutes has continued. Indeed, during the past eight years, the appellate division has issued over thirty opinions resulting from actions before the Commissioner of Insurance. Although resolving such disputes is, of course, the proper function of the appellate courts, we do not think it unreasonable to observe that these disputes are far too numerous and that the legislative intent behind our insurance statutes should not be so difficult to discern that almost quarterly decisions from the judicial branch of government

are required. We think the Legislature should hasten to rewrite the insurance laws in question in clear and unmistakable language.

This unfortunate trend to administer the insurance laws of our state before the courts has resulted in part, we think, as a result of the polarization of views. It serves little purpose for public officials to take the attitude that all insurance companies are constantly attempting to steal from the public. Insurance companies are not charitable institutions and are forced, under the laws of our state, to insure drivers with the worst possible driving records. It is equally useless for the insurance industry to take the view that public officials act for no legitimate purpose and seek only to harass the industry. It has long been established that the insurance business is charged with a public interest, and that its regulation is constitutional. *German Alliance Ins. Co. v. Lewis*, 233 U.S. 389, 34 S. Ct. 612, 58 L. Ed. 1011 (1914). Indeed, the public demands the effective regulation of the insurance industry.

Our Legislature, therefore, is presented with no enviable task. It must, as our statutory architect, evolve a plan which will best protect the public interest and ensure the liquidity and solvency of participating insurance companies in our state who must also be assured of a reasonable profit. This balancing of equities between the consuming public and the commercial sector can be done only by the legislative branch and the plan can be effectively administered only with the full cooperation of the executive branch of government. Most importantly, the Legislature, in formulating a regulatory scheme, should employ words that clearly and accurately reflect its intent so that the courts of this state will have some much needed guidance in interpreting those laws.

We hasten to add that we are not inadvertent to the concerns of plaintiffs in this action. There are seemingly apparent inequities in our insurance laws. For example, while this lawsuit was not so posited, we think the underlying concern with respect to recoupment surcharges is that those with safe driving records, defined by statute as "clean risks," and other insureds outside the Facility are now called upon to support the Facility and to subsidize the costs of insuring drivers with such poor driving records that insurance companies, absent the heavy hand of the law, would refuse to insure. This may well be a legitimate and worthy grievance; however, it is a political one which cannot properly be considered by an appellate court in ascertaining legislative intent. Such a grievance

is best remedied by bringing it to the attention of the legislative branch. Whether the cost of providing insurance to persons with poor driving records should be borne by that class alone or by the general driving public is a policy decision that only our General Assembly can make. When that decision has been made, we hope that our legislators will express it in clear and unmistakable language that the Commissioner of Insurance, the Governor, the Attorney General, insurance companies and courts can understand.

There are other concerns which have been brought before us in previous appeals to which the Legislature should give its attention. For example: (1) if the Legislature feels that the Commissioner should be vested with the authority to require that company data in insurance ratemaking hearings be audited, it should so provide, (2) if the General Assembly believes that income on invested capital should be considered in insurance ratemaking cases, it should so provide, (3) if the Legislature feels that the present method for calculating underwriting profit margins is inappropriate, it should clearly spell out the appropriate calculating methodology, (4) if the Legislature feels that the burden of proof in a ratemaking hearing should be placed on the Commissioner of Insurance, it should so provide. *See* 1980 Insurance Case I. Additionally, raised on oral argument was the issue of the propriety of having the Facility run by a board of governors, the membership of which consists entirely of *representatives of member insurance companies.* This is a question which we cannot address on this appeal. The Legislature in its wisdom clearly set out the composition of the Board of Governors; it is up to the Legislature, if it wishes, to change that composition.

These concerns and others of a similar nature have been the subject of extensive litigation before the courts, and the policy-making body of the state should resolve them once and for all. The court system in this state remains forever open to resolve legitimate justiciable controversies which will undoubtedly continue to occur in an area of the law as complex and important as this. However, no area of the law should be controlled by statutes which are so confusing and unwieldy that constant recourse to the judicial branch is inevitable. We hope that our Legislature, now in session, will resolve the issues before it in this area of the law expeditiously and express its intent in language which is crystal clear.

For the reasons stated above, we reverse the decision of the Court of Appeals. This matter is remanded to that court with

instructions that it remand to the Superior Court, Wake County, for reinstatement of the trial court order of 26 February 1980.

Reversed and remanded.