TYSON, Judge.
 

 *697
 

 I. Background
 

 Respondent, the North Carolina Reinsurance Facility ("the Facility"), is a statutory entity, consisting of all motor vehicle liability insurers in
 
 *698
 
 North Carolina as required members.
 
 N.C. Gen. Stat. § 58-37-5
 
 (2015). Discovery Insurance Company ("Discovery") is a Kinston, North Carolina-based insurance company engaged in selling motor vehicle insurance. Discovery was a member of the Facility at all times relevant to this appeal.
 

 "The Facility is a creation of North Carolina's Compulsory Automobile Liability Insurance Law."
 
 State ex rel. Hunt v. N. Carolina Reinsurance Facility
 
 ,
 
 302 N.C. 274
 
 , 283,
 
 275 S.E.2d 399
 
 , 402 (1981). "The Facility is a pool of insurers which insures drivers who the insurers determine they do not want to individually insure."
 

 Id.
 

 The pertinent provisions are codified in Article 37, Chapter 58 of the General Statutes.
 
 N.C. Gen. Stat. §§ 58-37-1
 
 to 58-37-75 (2015) (hereinafter referred to as "the Facility Act").
 

 All insurance companies which write motor vehicle insurance in North Carolina, are required to issue motor vehicle liability coverage insurance to any "eligible risk," as is defined in
 
 N.C. Gen. Stat. § 58-37-1
 
 , who applies for that coverage, if the coverage can be ceded to the Facility.
 
 N.C. Gen. Stat. § 58-37-25
 
 (a). After writing a motor vehicle policy, an insurer can retain it as a part of its voluntary business or cede it to the Facility.
 
 Hunt,
 

 302 N.C. at 283
 
 ,
 
 275 S.E.2d at 402
 
 .
 

 If the policy is ceded, the writing insurer pays the net premium to the Facility, less certain allowed expenses. The Facility becomes liable on that particular policy to reimburse the issuing insurer for claims paid.
 
 Id.
 
 at 283,
 
 275 S.E.2d at 402-3
 
 .
 

 When a loss and claim occurs under the policy, the ceding company settles the claim and is reimbursed by the Facility.
 

 Id.
 

 The Facility is only authorized to reinsure coverages arising under motor vehicle insurance policies required to satisfy The Motor Vehicle Safety and Financial Responsibility Act,
 
 N.C. Gen. Stat. §§ 20-279.1
 

 et seq
 
 ., together with any other motor vehicle insurance as is required by federal law or regulation, state law, state administrative code, or rule adopted by the North Carolina Utilities Commission.
 
 N.C. Gen. Stat. § 58-37-35
 
 (b). The Facility is required to operate on a no profit-no loss basis.
 
 N.C. Gen. Stat. § 58-37-35
 
 (l).
 

 In November 2011, Discovery uncovered a fraudulent scheme by one of its claims executives, Roland Steed ("Steed"). From early 2005 until November 2011, Steed issued Discovery claim checks to fictitious persons and entities in order to have the proceeds of those checks to be deposited into accounts he controlled. Steed reported the fraudulent payments as legitimate payments under his management and control.
 

 *586
 

 *699
 
 Under his scheme, Steed issued checks for fraudulent payments totaling approximately $5.2 million. Of that total, Steed attributed approximately $1.3 million of those payments to claims on auto liability policies, which had been ceded to the Facility by Discovery. Before Steed's scheme was uncovered, the Facility had reimbursed Discovery for the approximately $1.3 million in claims paid under these ceded policies.
 

 Discovery notified the Facility upon learning of Steed's fraudulent activity in November 2011. Discovery asked the Facility to keep Steed's fraud confidential from all, except a select few of the Facility's executives, to allow the Department of Insurance a period of time required to conduct a criminal fraud investigation.
 

 The Facility honored Discovery's request and did not independently investigate Steed's fraudulent payments, until after Steed and his co-conspirators were indicted in August 2012. Following Steed's indictment, the Facility confirmed the net total of the claims payments attributable to Steed's fraud and reimbursed to Discovery was $1,340,921.25.
 

 In a letter to Discovery dated 25 October 2013, Facility staff noted the Facility only reimburses companies for payments of valid claims. The letter repeated the Facility's conclusion that $1,340,921.25 in reported, but fraudulent, losses reimbursed by the Facility were not valid claim payments, but were fidelity losses that were ineligible for reimbursement. The Facility instructed Discovery to repay these losses to the Facility.
 

 Discovery requested a hearing, pursuant to
 
 N.C. Gen. Stat. § 58-37-65
 
 (a), before the Facility's Board of Governors ("the Facility Board") to dispute the Facility's staff's 25 October 2013 letter requesting Discovery to repay the loss payments attributable to Steed's frauds. The Facility Board's hearing took place on 24 July 2013. On 19 August 2013, the Facility Board issued a final decision and held Discovery was obligated to repay the Facility the $1,340,921.25 in fraudulent claims payments previously reimbursed by the Facility.
 

 Discovery appealed the Facility Board's decision to the Commissioner of Insurance pursuant to
 
 N.C. Gen. Stat. § 58-37-65
 
 (b). At a December 2013 meeting, the Facility Board learned Discovery had appealed the Facility Board's 19 August 2013 ruling and had not repaid the fraudulent reimbursements made by the Facility. The Facility Board instructed Facility staff to issue a letter and a Supplemental Account Activity Statement to Discovery on 16 December 2013.
 

 The Hearing Officer, on behalf of the Commissioner of Insurance ("the Commissioner"), issued an order which affirmed the ruling of the Facility Board on 20 October 2014.
 

 *700
 
 Discovery petitioned the Superior Court of Wake County for judicial review of the Commissioner's order pursuant to
 
 N.C. Gen. Stat. § 58-37-65
 
 (b). The trial court affirmed the Commissioner's Order on 18 November 2016. Discovery timely filed notice of appeal to this Court on 16 December 2016.
 

 II. Jurisdiction
 

 The trial court reviewed Discovery's appeal of the Hearing Officer's order as a civil case pursuant to
 
 N.C. Gen. Stat. § 58-2-75
 
 (b). Jurisdiction lies in this Court from a final order of the superior court pursuant to
 
 N.C. Gen. Stat. § 1-277
 
 (2015) and § 7A-27(b) (2015).
 

 III. Issues
 

 Discovery requests this Court review whether the Commissioner erred by: (1) holding the Facility acted within its statutory authority by ordering Discovery to repay the disputed claim payments; (2) finding the Facility was not required to institute a separate civil action against Discovery to recover the approximately $1.3 million at issue; (3) making findings of fact and conclusions of law regarding the audit responsibilities of the Facility, which are not supported by the whole record; (4) concluding that Discovery's affirmative defense of estoppel was not applicable; (5) not permitting pre-hearing discovery; and, (6) not considering the Facility's authority to issue the Supplemental Account Activity Statement.
 

 IV. Standard of Review
 

 N.C. Gen. Stat. § 58-37-65
 
 of the Facility Act provides that "[a]ll rulings or orders of the Commissioner under this section shall be
 
 *587
 
 subject to judicial review as approved in G.S. 58-2-75." This statute provides for judicial review of orders and decisions of the Commissioner by the filing of a petition within 30 days from the date of the delivery of a copy of the order or decision by the Commissioner. Pursuant to
 
 N.C. Reinsurance Facility v. Long
 
 ,
 
 98 N.C.App. 41
 
 ,
 
 390 S.E.2d 176
 
 (1990),
 
 N.C. Gen. Stat. § 58-2-75
 
 is to be read in conjunction with N.C. Gen. Stat. § 150B-51 of the Administrative Procedure Act ("APA").
 
 Long
 
 ,
 
 98 N.C.App. at 46
 
 ,
 
 390 S.E.2d at 179
 
 .
 

 Under N.C. Gen. Stat. 150B-51(b), the scope and standard of review is that in "reviewing a final decision, the court may affirm the decision of the agency or remand the case to the agency ... for further proceedings." The court:
 

 may also reverse or modify the [agency's] decision ... if the substantial rights of the petitioners may have been
 
 *701
 
 prejudiced because the [agency's] findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency;
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 (5) Unsupported by substantial evidence ... in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 N.C. Gen. Stat. § 150B-51(b) (2015).
 

 The particular standard applied to issues on appeal depends upon the nature of the error asserted. "It is well settled that in cases appealed from administrative tribunals, questions of law receive
 
 de novo
 
 review, whereas fact-intensive issues such as sufficiency of the evidence to support an agency's decision are reviewed under the whole-record test."
 
 N.C. Dep't of Env't & Nat. Res. v. Carroll
 
 ,
 
 358 N.C. 649
 
 , 659,
 
 599 S.E.2d 888
 
 , 894 (2004) (brackets, quotation marks and citation omitted).
 

 Errors asserted under subsections 150B-51(b)(1)-(4) are reviewed
 
 de novo
 
 . N.C. Gen. Stat. § 150B-51(c) (2015). Under the
 
 de novo
 
 standard of review, the reviewing court "considers the matter anew and freely substitutes its own judgment[.]"
 
 Carroll
 
 ,
 
 358 N.C. at 660
 
 ,
 
 599 S.E.2d at 895
 
 (citation, internal quotation marks, and brackets omitted).
 

 When the error asserted falls within subsections 150B-51(b)(5) and (6), this Court applies the "whole record standard of review." N.C. Gen. Stat. § 150B-51(c) (2015). Under the whole record test,
 

 [the reviewing court] may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter
 
 de novo
 
 . Rather, a court must examine all the record evidence-that which detracts from the agency's findings and conclusions as well as that which tends to support them-to determine whether there is substantial evidence to justify the agency's decision.
 

 Carroll
 
 ,
 
 358 N.C. at 660
 
 ,
 
 599 S.E.2d at 895
 
 (internal citations and quotation marks omitted). " 'Substantial evidence' means relevant evidence
 
 *702
 
 a reasonable mind might accept as adequate to support a conclusion." N.C. Gen. Stat. § 150B-2(8c) (2015).
 

 V. Analysis
 

 A. The Facility Board Did Not Exceed Its Authority by Ordering Repayment
 

 Discovery argues the Facility Act does not authorize the Facility to issue an order of repayment. We disagree.
 

 When reviewing an action of the Facility Board, the Commissioner determines whether the challenged Facility action was taken in accordance with the Facility Act, the Facility's Plan of Operation and the Facility's Standard Practice Manual.
 
 N.C. Gen. Stat. § 58-37-65
 
 (c). Rule E of Section 5 of the Standard Practice Manual states "[f]idelity losses arising out of claims handling shall be the sole responsibility of the member company." Chapter 7.C of Section 4 of the Standard Practice Manual provides that "errors detected through the ... functions of the Facility will be reported to the carrier with appropriate instructions for prompt correction." Regarding
 
 *588
 
 the power of the Facility Board, the Facility Act provides in pertinent part:
 

 (g) Except as may be delegated specifically to others in the plan of operation or reserved to the members, power and responsibility for the establishment and operation of the Facility is vested in the Board of Governors, which power and responsibility
 
 include but is not limited to
 
 the following:
 

 ....
 

 (12) To adopt and enforce all rules and
 
 to do anything else where the Board is not elsewhere herein specifically empowered which is otherwise necessary to accomplish the purpose of the Facility
 
 and is not in conflict with the other provisions of this Article.
 

 N.C. Gen. Stat. § 58-37-35
 
 (g)(12) (emphasis supplied).
 

 1. Canons of Statutory Construction
 

 The rules governing this Court's review and construction of the General Statutes are well established. "[W]hen the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations
 
 *703
 
 not contained therein."
 
 State ex rel. Commissioner of Ins. v. North Carolina Rate Bureau
 
 ,
 
 43 N.C.App. 715
 
 , 719-20,
 
 259 S.E.2d 922
 
 , 925 (1979) (quoting
 
 Norris v. Home Security Life Insurance Co.,
 

 42 N.C.App. 719
 
 , 721,
 
 257 S.E.2d 647
 
 , 648 (1979) ).
 

 "[A] statute, being remedial, should be construed liberally, in a manner which assures fulfillment of the beneficial goals for which it is enacted and which brings within it all cases fairly falling within its intended scope."
 
 Burgess v. Joseph Schlitz Brewing Co.
 
 ,
 
 298 N.C. 520
 
 , 524,
 
 259 S.E.2d 248
 
 , 251 (1979) (citing
 
 Hicks v. Albertson
 
 ,
 
 284 N.C. 236
 
 ,
 
 200 S.E.2d 40
 
 (1973) ;
 
 Weston v. Lumber Co
 
 .,
 
 160 N.C. 263
 
 ,
 
 75 S.E. 800
 
 (1912) ).
 

 2. Discovery's Contentions
 

 Discovery contends the Commissioner erred by concluding as a matter of law "[t]he decision of the Board is thus not inconsistent with any provision of the Facility Act or with any provision of the Plan of Operation or the Manual." Discovery asserts the Commissioner erred because no express authority empowers the Facility to order Discover to repay the approximately $1.3 million fraudulent payments at issue in the Facility Act, the Plan of Operation, and the Standard Practice Manual.
 

 The Facility Act is remedial in nature and is to be construed liberally.
 
 Burgess
 
 ,
 
 298 N.C. 520
 
 at 524,
 
 259 S.E.2d at 251
 
 . The Facility Act was clearly enacted to serve the remedial purpose of establishing a system of reinsurance to ensure that North Carolina drivers can obtain vehicle liability coverage from insurers, which companies are otherwise unwilling to cover them.
 
 See
 

 Hunt
 
 ,
 
 302 N.C. at 283
 
 ,
 
 275 S.E.2d at 402
 
 (stating the Facility "is a creature of North Carolina's Compulsory Automobile Liability Insurance Law," and is "[e]ssentially a pool of insurers which insures drivers who the insurers determine they do not want to individually insure.").
 

 3. Facility Board's Authority
 

 Discovery does not dispute that the approximately $1.3 million of fraudulently paid claims was attributable to Steed's actions of "fidelity losses arising out of claims handling." Rule E of Section 5 of the Standard Practice Manual prohibits the Facility from being responsible for "fidelity losses arising out of claims handling" and squarely places the responsibility to absorb such losses upon the member company. The Commissioner properly concluded the Facility Board acted within the scope of its authority under the Facility Act, by ordering Discovery to repay the sums the Facility fraudulently paid.
 

 *704
 
 Although stated in general terms,
 
 N.C. Gen. Stat. § 58-37-35
 
 (g)(12) expressly grants the Facility Board the authority "to do anything else ... which is otherwise necessary to accomplish the purpose of the Facility." The superior court properly affirmed the Commissioner's decision that the Facility Board had acted within its statutory authority to order Discovery to repay the approximately $1.3 million.
 
 See
 

 *589
 

 Burgess
 
 ,
 
 298 N.C. at 524
 
 , 259 S.E.2d at 251 (construing a remedial statute liberally).
 

 The Facility was informed that approximately $1.3 million in reimbursements made to Discovery were actually fraudulent "fidelity losses arising out of claims handling" and attributable to Discovery's employee, Steed. Discovery is required to bear these losses pursuant to Rule E of Section 5 of the Standard Practice Manual. In ordering Discovery to repay the approximately $1.3 million in fraudulent payments, the Facility acted within its statutory authority to do what "is otherwise necessary to accomplish the purpose of the Facility ...."
 
 N.C. Gen. Stat. § 58-37-35
 
 (g)(12). Discovery's argument that the Facility acted outside the scope of its statutory authority is overruled.
 

 B. The Facility is Not Required to Commence a Civil Action to Recover Reimbursements
 

 Discovery argues that because the Facility Act vests the Facility Board with authority "to sue and be sued in the name of the Facility[,]" the Facility's proper and only means for seeking recovery of the fraudulent reimbursement losses would be for the Facility to institute a civil action in superior court.
 
 N.C. Gen. Stat. § 58-37-35
 
 (g)(1). We disagree.
 

 N.C. Gen. Stat. § 58-37-35
 
 (g)(1) provides:
 

 (g) Except as may be delegated specifically to others in the plan of operation or reserved to the members, power and responsibility for the establishment and operation of the Facility is vested in the Board of Governors, which power and responsibility include but is not limited to the following:
 

 (1) To sue and be sued in the name of the Facility. No judgment against the Facility shall create any direct liability in the individual member companies of the Facility.
 

 Even though
 
 N.C. Gen. Stat. § 58-37-35
 
 (g)(1) provides statutory authority for the Facility Board to sue on behalf of the Facility, Discovery's contention that this statute is the sole means under which the Facility can seek reimbursement from Discovery under these circumstances is without merit.
 

 *705
 
 Chapter 7.C of Section 4 of the Standard Practice Manual provides that "errors detected through the ... functions of the Facility will be reported to the carrier with appropriate instructions for prompt correction." Additionally, Rule E of Section 5 of the Standard Practice Manual prohibits the Facility from being responsible for "fidelity losses arising out of claims handling" and places the responsibility for such losses on the member company. Here, it is undisputed that over $1.3 million in fraudulent reimbursement payments were specifically requested by Discovery, though Steed, and were paid by the Facility under the mistaken belief that these were reimbursements for
 
 bona fide
 
 claims under policies ceded to and covered by the Facility.
 

 There is no dispute these reimbursements were paid for fraudulent claims attributable to the fidelity losses of Discovery specifically caused by their employee Steed. Chapter 7.C of Section 4 of the Standard Practice Manual permits the Facility to report errors in claims and give "appropriate instructions for prompt correction."
 
 N.C. Gen. Stat. § 58-37-35
 
 (g)(12) grants the Facility Board the authority "to do anything else ... which is otherwise necessary to accomplish the purpose of the Facility."
 

 N.C. Gen. Stat § 58-37-35(l) requires the Facility to operate on a no-profit no-loss basis. Chapter 7.C of Section 4 of the Standard Practice Manual,
 
 N.C. Gen. Stat. §§ 58-37-35
 
 (l) and 58-37-35(g)(12) construed together provides the Facility Board with the authority to order a member company to correct claims reimbursements erroneously paid by the Facility due to "fidelity losses arising out of claims handling."
 

 Discovery cites two cases it asserts are analogous to the case at bar.
 
 Charlotte Liberty Mut. Ins. Co. v. State ex rel. Lanier
 
 dealt with whether the Commissioner of Insurance had the authority to enforce an insurance rule by issuing a letter ordering an insurance company not to enter a proposed lease transaction.
 
 Charlotte Liberty
 
 ,
 
 16 N.C.App. 381
 
 , 381-83,
 
 192 S.E.2d 57
 
 , 57-58 (1972). This Court determined, "[c]learly the statutes creating the Department of Insurance and prescribing the powers and duties of the Commissioner,
 
 *590
 
 do not purport to grant him the power of issuing restraining orders and injunctions."
 
 Id.
 
 at 385,
 
 192 S.E.2d at 59
 
 . The Court noted, "[i]n administering the laws relative to the insurance industry, the Commissioner, if he deems it necessary, may apply to the courts for restraining orders and injunctions ...."
 

 Id.
 

 The facts and holding in
 
 Charlotte Liberty
 
 are not analogous to this case. The statutes creating the Department of Insurance did not grant the Commissioner the direct power to issue restraining orders and injunctions. Chapter 7.C of Section 4 of the Standard Practice Manual
 
 *706
 
 reflects the authority of the Facility to instruct member companies to correct "errors detected through the ... functions of the Facility."
 

 Before Steed's fraudulent actions were uncovered, Discovery and the Facility both conducted business under the erroneous representation that the claim payments submitted by Steed to the Facility for reimbursement were for legitimate claims under ceded policies. The Facility Board acted within its statutory authority to order Discovery to reverse the reimbursement payments, and was neither limited nor required by
 
 N.C. Gen. Stat. § 58-37-35
 
 (g)(1) to bring suit in the courts to recover those reimbursements. Discovery's argument is overruled.
 

 C. The Commissioner's Findings of Fact and Conclusions of Law Are Supported by the Whole Record
 

 Defendant challenges the Commissioner's Findings of Fact 12 and 13 and Conclusion of Law 13 regarding the Facility's audit responsibilities and asserts the Findings of Fact are not supported by substantial evidence in the whole record. We disagree.
 

 We first note that the majority of the Commissioner's Findings of Fact are not challenged and are binding upon appeal.
 
 Koufman v. Koufman
 
 ,
 
 330 N.C. 93
 
 , 97,
 
 408 S.E.2d 729
 
 , 731 (1991) ("Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal.") (citations omitted). Because Findings of Fact 12 and 13 are the only findings, which are challenged by Discovery with specific arguments, any other issues concerning the remaining challenged findings are abandoned. N.C. R. App. P. 28(b)(6).
 

 1. Finding of Fact 12
 

 The Commissioner's Finding of Fact 12 in the amended order states:
 

 The Facility does not conduct claims audits for the purpose of identifying potential fraudulent claims activity by claims representatives of its member companies; and the Facility does not represent to its member companies that its claims audit process is designed to or capable of identifying fraudulent conduct by claims representatives of its member companies
 

 Discovery contends substantial evidence contradicts the Commissioner's Finding of "The Facility does not conduct claims audits for the purpose of identifying potential fraudulent claims activity by claims representatives of its member companies ...." Discovery cites
 
 *707
 
 the testimony of Edith Davis, the Chief Operating Officer of the Facility, to dispute Finding of Fact 12:
 

 A: The audit responsibilities of the Facility are to audit the member companies and to verify, if you will, the transactions that are being reported to the Facility and look for, you know, poor claims-handling practices, poor underwriting-the answer I'm giving is in context to claims, not to premiums and underwriting.
 

 Moreover, Discovery cites Section 6 of the Facility's Standard Practice Manual:
 

 The Facility will review and examine statistical reports and comparisons in order to detect any adverse trends which shall be thoroughly investigated. The Claim Staff, Claim Quality Control Committee, the Audit Staff and both the Audit Committee and Compliance Committee shall coordinate the efforts and exchange information. If these reviews indicate any irregularities, appropriate action will be taken.
 

 After reviewing the portion of Edith Davis' testimony and Section 6 of the Standard Practice Manual cited by Discovery in light of the whole record, the "poor claims-handling practices" referred to by Edith Davis and the "irregularities" referred to in Section 6 of the Standard Practice Manual do not
 
 *591
 
 refer to fraudulent claims made by member companies and their employees.
 

 The Standard Practice Manual expressly states that the purpose of Facility audits of business reinsured with the Facility is "to determine that procedures established by the Plan of Operation and the Rules of Operation have been complied with, and that policies that have been reinsured are receiving the same service as those which are not reinsured."
 

 Additional substantial evidence in the record supports Finding of Fact 12. The Facility Act vests the Facility Board with the "power and responsibility ... to establish procedures for reviewing claims practices of member companies to the end that claims to the account of the Facility will be handled fairly and efficiently."
 
 N.C. Gen. Stat. § 58-37-35
 
 (g)(11). The Act requires "[e]ach member company shall authorize the Facility to audit that part of the company's business which is written subject to the Facility in a
 
 manner and time prescribed by the Board of Governors
 
 ."
 
 N.C. Gen. Stat. § 58-37-35
 
 (h) (emphasis supplied).
 

 *708
 
 The "manner and time" for audits conducted by the Facility are outlined in Section 6 of the Facility's Standard Practice Manual. The Manual sets forth the internal audit responsibilities of its member companies and requires: "each member is
 
 responsible to ensure that its own internal control and spot-check procedure is sufficient to detect any irregularity in handling business
 
 which is either ceded to the Facility or with respect to which recoupment surcharges are applicable." (Emphasis supplied.)
 

 The Manual further specifies standards regarding each member's internal control procedure:
 

 These controls include, but are not restricted to, the following items:
 

 1. That all cessions, premiums and claims are accurately and promptly reported to the Facility;
 

 2. That all reports, whether on a regular basis or by special call, are filed accurately and promptly;
 

 3. That all agents are fully complying with the Plan of Operation and Rules of Operation;
 

 4. That ceded policies are properly rated and ceded claims properly handled; [and,]
 

 5. That recoupment surcharges for all policies subject to recoupment are properly determined and promptly reported to the Facility.
 

 Additionally, the Standard Practice Manual requires member companies "shall obtain claimant confirmation on a reasonably representative number of claim payments on Facility ceded business." When requested by the Facility, member companies must provide reports of their claim confirmation activities. In addition to the member companies' claim confirmation duties, the Facility retains the right to "confirm with the payee of claim payments made on ceded business[,]" but is not required to do so.
 

 Furthermore, Edith Davis testified:
 

 We have no responsibility for protecting the company in their claims-handling procedures .... I have three auditors and over a hundred member companies and about $675 million worth of losses being reported to the Facility. We have no responsibility to protect the member company and their own claim-handling procedures. That responsibility is solely at the member company.
 

 *709
 
 After carefully reviewing the record, substantial evidence in the record supports the Commissioner's Finding of Fact 12.
 

 2. Finding of Fact 13
 

 Discovery also challenges the Commissioner's Finding of Fact 13, which states:
 

 When a Facility claims auditor determines that there is not sufficient documentation to substantiate a payment made on a given claim, it is the policy and practice of the Facility to ask the appropriate claims contact person at the member company either to provide the appropriate documentation or to reverse the earlier reimbursement of that payment by the Facility.
 

 Edith Davis testified that when the Facility conducts a claims audit, it looks for the
 
 *592
 
 appropriate documentation for a claim payment. Ms. Davis furthered testified:
 

 Q: All right. Typically when an auditor asks the-or notes for the company that there's-they're not finding documentation in the claim file for a particular claim payment, what does your auditor ask the company to do?
 

 A: Provide documentation.
 

 Q: And what happens if the company does not provide documentation?
 

 A: They're advised to reverse the transaction.
 

 Q: So is it correct that it is a typical occurrence between the Facility staff and a company that if they don't-if the Facility auditor doesn't see appropriate documentation in the claim file, that it asks the company to either provide the documentation or reverse the transaction?
 

 A: Yes.
 

 Discovery references a 2004 audit in which the Facility identified issues with Discovery's policy claims that were managed by Steed and ceded to the Facility. The Facility's 2004 Audit Summary report recommended:
 

 Based on these 3 files with reporting errors admitted by the carrier and a previous audit which revealed 2 files with incorrectly reported accident dates, may wish to have
 
 *710
 
 claims dept [sic] review more files from this carrier due to possible reporting errors.
 

 Discovery asserts cross-examination testimony of Edith Davis, given before the Hearing Officer, indicates the Facility failed to follow-up with Steed and Discovery regarding the discrepancies referred to in the 2004 Audit Summary report:
 

 Q: And based on the information that we provided [...] but based on the information that we provided, did you-was there any information in there that would provide that Mr.-or that would support the fact that Mr. Steed, on behalf of Discovery at that time, provided an explanation for these discrepancies?
 

 A: There was not. I-
 

 Discovery characterizes this testimony as contradicting Finding of Fact 13 to the extent it indicates it was not the "practice of the Facility to ask the appropriate claims contact person at the member company either to provide the appropriate documentation or to reverse the earlier reimbursement of that payment[.]"
 

 "It is for the agency, not a reviewing court, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence[,] if any.''
 
 Carroll
 
 ,
 
 358 N.C. at 674
 
 ,
 
 599 S.E.2d at 904
 
 (alteration in original) (internal quotation marks and citations omitted). To the extent contradictions exist in the evidence pertinent to Finding of Fact 13, the Hearing Officer, acting on behalf of the Commissioner, weighed the evidence, assessed witness' credibility, and drew inferences thereon to resolve those factual conflicts.
 
 Id
 
 .
 

 The Hearing Officer's resolution of the material conflicts in the evidence has a rational basis in the evidence presented. The testimony of Edith Davis affirmatively states the practice of the Facility's auditor was to ask a member company to either provide claim documentation or reverse the transaction. Substantial evidence supports Finding of Fact 13. Discovery's argument is overruled.
 

 Discovery additionally argues record evidence does not support Conclusion of Law 13. We disagree.
 

 Conclusion of Law 13 states:
 

 The Facility did not discover the fraudulent conduct of Discovery's employee Steed before 5 November 2011,
 
 *711
 
 and the Facility could not reasonably have discovered his fraud before that date.
 

 Findings of Fact 7 through 11, and 16 through 19, none of which are challenged by Discovery on appeal, constitute substantial evidence to support this conclusion of law. "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal."
 
 Koufman
 
 ,
 
 330 N.C. at 97
 
 ,
 
 408 S.E.2d at 731
 
 (citations omitted).
 

 Those Findings of Fact are:
 

 *593
 
 7. Before 5 November 2011, neither the Facility nor any person at Discovery other than Steed was aware of Steed's fraudulent conduct.
 

 8. Steed issued at least 936 fraudulent checks between 1 January 2005 and 5 November 2011 for a total sum exceeding $5,200,000.00, which payments were actually paid to Steed and/or a number of co-conspirators involved in his fraudulent scheme. Of that total, Discovery submitted $1,347,168.55 to the Facility for reimbursement, and obtained reimbursement from the Facility for fraudulent claim payments in the amount of $1,347,168.55. During the normal course of operations in responding to Facility questions on its routine, random claims audit process, Discovery reversed one or more of the payments that resulted from Steed's fraudulent claims activities, and one such reversal had been inadvertently included in this total. Thus at the time of the decision of the Board here at issue, the Facility had reimbursed to Discovery the net amount of $1,340,921.25 for payments that had been confirmed to be fraudulent payments.
 

 9. Each year [the] Facility receives and processes approximately $675,000,000 in claims from its member companies. On average during the Relevant Timeframe, Discovery reported approximately $13,500,000.00 in annual claims payments.
 

 10. The Facility has a small audit staff that performs various different types of audits on the motor vehicle liability insurance policies ceded to it by its member companies. The audits include, among others, premium audits, recoupment audits, and claims audits. For claims audits,
 
 *712
 
 the Facility audits 10 to 20 claim files from each member company each year. This typically means that the Facility audits a very small percentage of the claim payments submitted for reimbursement by member companies each year. Discovery, for example, reports in excess of 6,000 loss transactions to the Facility on an annual basis.
 

 11. The claim files selected for audit are generally randomly selected. The items checked during a typical claims audit include whether the policy was eligible for cession; whether the policy was properly ceded; whether the policy included coverage for the vehicle involved in the claim; whether the accident occurred during the period the policy was ceded to the Facility; whether the claim file included appropriate documentation for the claim payment; and whether any salvage and subrogation had been properly handled and reported to the Facility.
 

 ....
 

 16. Discovery has identified a small number of fraudulent claim payments by Steed that occurred in claim files that happened to have been audited by the Facility and that were questioned by a Facility claims auditor due to the lack of appropriate documentation in the claims file.
 

 17. Steed was designated by Discovery as the person to whom the Facility was directed to communicate regarding any claim-related issues, including questions relating to claim audits.
 

 18. On each of the small number of occasions that a Facility auditor requested documentation for the payments that ultimately were determined to be fraudulent, Steed advised the Facility that these claim payments had been submitted inadvertently because of an administrative error and that Discovery would reverse the charges. During and before the Relevant Timeframe, Facility claims auditors also requested documentation of claim payments from Steed on numerous claims that were not fraudulent which requests resulted in Discovery's reversal of reimbursements for similar reasons.
 

 19. The rate at which Facility auditors encountered documentation errors and reversals of charges based on the
 
 *713
 
 inadvertent submission of payments to the Facility by Discovery was not out of proportion to the rate of such errors among other similarly situated member companies.
 

 Unchallenged findings of fact support the Commissioner's Conclusion of Law 13.
 
 See
 

 Hershner v. N.C. Dep't of Admin
 
 .,
 
 232 N.C.App. 552
 
 , 553,
 
 754 S.E.2d 847
 
 , 848 (2014) ("Where unchallenged findings of fact support the decisions of the administrative law
 
 *594
 
 judge ... the trial court did not err in adopting their findings of fact and conclusions of law."). Discovery's arguments contesting the Commissioner's Findings of Fact 12 and 13 and Conclusion of Law 13 are without merit and are overruled.
 

 D. The Doctrine of "Unclean Hands" Bars Discovery's Equitable Defenses
 

 Discovery argues the Commissioner erred in concluding Discovery's appeal of the Board's decision is not a civil action and equitable doctrines of estoppel and ratification do not apply. Discovery asserts the Facility is estopped from seeking repayment for the fraudulent claims at issue, the Facility ratified Steed's fraudulent conduct, and Discovery should not be required to repay the reimbursed sums at issue under general equitable principles. We disagree.
 

 The Commissioner made the following relevant Conclusions of Law:
 

 16. Because this is not a civil action, common law doctrines, including the doctrines of estoppel, ratification, and general equitable relief are not applicable to this statutory appeal.
 

 17. Even if this was a civil action, the doctrines of estoppel, ratification, and general equitable relief would not preclude the Facility from requiring repayment by Discovery of previously reimbursed fidelity losses.
 

 "Equity is for the protection of innocent persons and is a tool used by the court to intervene where injustice would otherwise result.
 
 See
 

 Cunningham v. Brigman,
 

 263 N.C. 208
 
 , 211,
 
 139 S.E.2d 353
 
 , 355 (1964) (only innocent persons may claim the benefit of equitable estoppel)."
 
 Swan Quarter Farms, Inc. v. Spencer
 
 ,
 
 133 N.C.App. 106
 
 , 110,
 
 514 S.E.2d 735
 
 , 738,
 
 disc. review denied
 

 350 N.C. 850
 
 ,
 
 539 S.E.2d 651
 
 (1999).
 

 In determining whether the doctrine of estoppel applies, "the conduct of both parties must be weighed in the balances of equity and the party claiming the estoppel no less
 
 *714
 
 than the party sought to be estopped must conform to fixed standards of equity."
 
 Hawkins v. M & J Finance Corp.
 
 ,
 
 238 N.C. 174
 
 , 177,
 
 77 S.E.2d 669
 
 , 672 (1953). The essential elements of equitable estoppel relating to the party estopped are: (1) conduct which amounts to a false representation or concealment of material facts, or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts.
 
 Hawkins
 
 ,
 
 238 N.C. at 177-78
 
 ,
 
 77 S.E.2d at 672
 
 . The elements relating to the party claiming estoppel are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.
 
 Id
 
 .
 

 ....
 

 A party cannot rely on equitable estoppel if it "was put on inquiry as to the truth and had available the means for ascertaining it."
 
 Hawkins
 
 ,
 
 238 N.C. at 179
 
 ,
 
 77 S.E.2d at 673
 
 (citation omitted).
 

 Wade S. Dunbar Ins. Agency, Inc. v. Barber
 
 ,
 
 147 N.C.App. 463
 
 , 470,
 
 556 S.E.2d 331
 
 , 336 (2001). "[H]e who comes into equity must come with clean hands; otherwise his claim to equity will be barred by the doctrine of unclean hands."
 
 Hurston v. Hurston,
 

 179 N.C.App. 809
 
 , 814,
 
 635 S.E.2d 451
 
 , 454 (2006).
 

 Discovery asserts the equitable doctrines of estoppel, ratification, and quasi-estoppel bar the Facility from seeking repayment of the fraudulent claims previously reimbursed by the Facility.
 
 See
 

 Whitacre P'ship v. Biosignia, Inc.
 
 ,
 
 358 N.C. 1
 
 , 18,
 
 591 S.E.2d 870
 
 , 881 (2004)
 
 (
 
 recognizing quasi-estoppel as a branch of equitable estoppel);
 
 Pittman v. Barker,
 

 117 N.C.App. 580
 
 , 591,
 
 452 S.E.2d 326
 
 , 332, ("[E]quitable defenses ... [include] estoppel, laches, ratification, and waiver[.]"),
 
 disc. review denied
 

 340 N.C. 261
 
 ,
 
 456 S.E.2d 833
 
 (1995).
 

 *595
 

 *715
 
 Presuming,
 
 arguendo
 
 , that Discovery is correct in asserting common law equitable principles are applicable here, Discovery cannot claim the benefit of equitable defenses because of the doctrine of unclean hands.
 

 Discovery argues the Facility is estopped from denying the legitimacy of the reimbursements paid to Discovery caused by Steed's fraud, because the Facility through its claims audit process did not discover Steed was committing fraud.
 

 The Facility's Standard Practice Manual mandates "[m]ember companies shall obtain claimant confirmation on a reasonably representative number of claim payments on Facility ceded business." Discovery represented in annual Internal Control Questionnaires submitted to the Facility it had proper internal control procedures in place designed to detect fraudulent activity. The record shows Stuart Lindley, the President of Discovery, provided verbal information to the Facility Board indicating that:
 

 At no time during the period 2005 through 2011 did Discovery have in place any internal audit procedure designed to routinely or randomly audit claims files under the management or control of Steed, nor any process to verify that claims checks generated by Steed were for payment of legitimate claims ....
 

 Discovery cannot be heard to argue the Facility is precluded from seeking reimbursement for the fraudulent claim payments because the Facility allegedly did not follow its claims audit process. The record evidence shows Discovery itself was in violation of its duty under the Standard Practice Manual to "obtain claimant confirmation on a reasonably representative number of claim payments."
 

 As between two innocent parties, the party who put the individual in a position to commit the fraudulent conduct, and failed to reasonably supervise his actions, should bear the loss.
 
 Johnson v. Schultz
 
 ,
 
 364 N.C. 90
 
 , 93,
 
 691 S.E.2d 701
 
 , 704 (2010) (citations omitted). Even if common law principles do apply in this case, Discovery itself would be liable and bear the loss for the fraudulent activity of its employee, Steed.
 

 The general rule is that a principal is responsible to third parties for injuries resulting from the fraud of his agent committed during the existence of the agency and within the scope of the agent's actual or apparent authority from the principal, even though the principal did not know or authorize the commission of the fraudulent acts ....
 

 *716
 

 Parsons v. Bailey
 
 ,
 
 30 N.C.App. 497
 
 , 501,
 
 227 S.E.2d 166
 
 , 168 (1976) (citations and quotation marks omitted). "It makes no difference that the agent was acting in his own behalf and not in the interests of the principal when the fraudulent act was perpetrated unless the third parties had notice of that fact."
 
 Id.
 
 at 501-02,
 
 227 S.E.2d at 168
 
 (citations omitted).
 

 Based upon the Commissioner's undisputed Finding of Fact 7, "Before 5 November 2011, neither the Facility nor any person at Discovery other than Steed was aware of Steed's fraudulent conduct." Therefore, Discovery did not have notice Steed was acting on his own behalf.
 
 See
 
 id.
 

 It is undisputed that Steed committed fraud in filing fraudulent claims under his authority to manage claims on behalf of Discovery. Even though Discovery "did not know or authorize" Steed's fraud, as his employer it would still be responsible for Steed's fraud under common law principles.
 
 See
 

 id
 
 . at 501,
 
 227 S.E.2d at 168
 
 .
 

 Based on Discovery's unclean hands, attributable to its responsibility for Steed's fraud under common law principles, the Commissioner did not abuse his discretion in determining "estoppel, ratification, and general equitable relief would not preclude the Facility from requiring repayment by Discovery of previously reimbursed fidelity losses." Discovery's arguments are overruled.
 

 E. The Commissioner Did Not Err by Denying Pre-Hearing Discovery
 

 Discovery asserts the Commissioner erred in ordering that the parties had no right to formal discovery. Discovery argues it should have been allowed to conduct pre-hearing discovery prior to the appeal hearing before the Commissioner. We disagree.
 

 Discovery cites
 
 N.C. Gen. Stat. § 58-2-50
 
 , governing hearings before the Commissioner,
 
 *596
 
 in support of its argument. This statute provides, in relevant part:
 

 All hearings shall,
 
 unless otherwise specially provided
 
 , be held in accordance with this Article and Article 3A of Chapter 150B of the General Statutes and at a time and place designated in a written notice given by the Commissioner to the person cited to appear.
 

 N.C. Gen. Stat. § 58-2-50
 
 (emphasis supplied). N.C. Gen. Stat. § 150B-39 provides for the right of pre-hearing discovery.
 

 Contrary to Discovery's assertion that
 
 N.C. Gen. Stat. § 58-2-50
 
 governs the hearing before the Commissioner, the proceedings before the Commissioner are specifically governed by N.C. Gen. Stat § 58-37-65. N.C. Gen. Stat § 58-37-65 states, in relevant part:
 

 *717
 
 (a) ... any member of the Facility and any agent duly licensed to write motor vehicle insurance, may request a formal hearing and ruling by the Board of Governors of the Facility on any alleged violation of or failure to comply with the plan of operation or the provisions of this Article or any alleged improper act or ruling of the Facility directly affecting him as to coverage or premium or in the case of a member directly affecting its assessment ....
 

 (b) Any formal ruling by the Board of Governors may be appealed to the Commissioner by filing notice of appeal with the Facility and Commissioner within 30 days after issuance of the ruling.
 

 ....
 

 (f) All rulings or orders of the Commissioner under this section shall be subject to judicial review as approved in G.S. 58-2-75.
 

 N.C. Gen. Stat § 58-37-65 (2015).
 

 Because N.C. Gen. Stat § 58-37-65 specifically covers appeals of formal rulings by the Facility Board to the Commissioner, it controls over
 
 N.C. Gen. Stat. § 58-2-50
 
 .
 
 Trustees of Rowan Tech. v. J. Hyatt Hammond,
 

 313 N.C. 230
 
 , 238,
 
 328 S.E.2d 274
 
 , 279 (1985) (citations omitted) ("Where one of two statutes might apply to the same situation, the statute which deals more directly and specifically with the situation controls over the statute of more general applicability.").
 

 N.C. Gen. Stat. § 58-2-52
 
 provides: "[t]he Commissioner may adopt rules for the hearing of appeals by the Commissioner or the Commissioner's designated hearing officer under ... § 58-37-65" and "these rules may provide for ... discovery ...."
 
 N.C. Gen. Stat. § 58-2-52
 
 (2015). The Commissioner has not adopted any rules providing for formal discovery in an appeal under
 
 N.C. Gen. Stat. § 58-37-65
 
 .
 

 The only rules adopted by the Commissioner pertaining to the conduct of formal discovery in hearings before the Commissioner are those set forth at 11 N.C.A.C. 1.0401
 
 et seq
 
 . Those rules apply solely to contested cases governed by N.C. Gen. Stat. § 150B-38
 
 et seq
 
 .
 
 See
 
 11 N.C.A.C. 01.0401 (granting party right to appeal in accordance with "Article 3A of G.S. 150B"); 11 N.C.A.C. 01.0414(4) ("Except as otherwise provided by statute, the rules contained in this Section govern the conduct of contested case hearings under Chapter 58 of the General Statutes.")
 

 *718
 
 An appeal under
 
 N.C. Gen. Stat. § 58-37-65
 
 is not a contested case within the meaning of N.C. Gen. Stat. § 150B.
 
 N.C. Gen. Stat. § 58-2-52
 
 (c) (specifying that appeals under
 
 N.C. Gen. Stat. §§ 58-36-35
 
 ,
 
 58-37-65
 
 , 58-45-50, 58-46-30, 58-48-40(c)(7), 58-48-42, and 58-62-51(c) are not contested cases within the meaning of N.C. Gen. Stat. § 150B (emphasis supplied)).
 

 N.C. Gen. Stat. § 58-37-65
 
 is the specific statute controlling over
 
 N.C. Gen. Stat. § 58-2-50
 
 . This statute does not provide for formal discovery for this hearing and the Commissioner has not promulgated any rules providing for formal discovery under
 
 N.C. Gen. Stat. § 58-2-52
 
 . The Hearing Officer did not err in concluding the parties were not entitled to conduct formal discovery. Discovery's argument is overruled.
 

 F. The Decision of the Facility Board to Issue the Supplemental Account Activity Statement is Not Before this Court
 

 Defendant contends the Facility was without authority to issue the letter and attached Supplemental Account Activity Statement on
 
 *597
 
 16 December 2013. However, Discovery did not appeal the 16 December 2013 decision of the Facility to issue the letter and Supplemental Account Activity Statement pursuant to
 
 N.C. Gen. Stat. § 58-37-65
 
 (b). Because Discovery never appealed the decision of the Facility to issue the letter and Supplemental Account Activity Statement, the Commissioner correctly concluded the 16 December 2013 action of the Facility was not properly before him. The 16 December 2013 action was not the subject of judicial review at the superior court and is not properly before this Court. This argument is dismissed.
 

 VI. Conclusion
 

 After review of the Commissioner's order and the superior court's review, we hold the order reflects a rational consideration of the evidence. The evidence in the record supports the Commissioner's findings of fact, which in turn support the ultimate conclusions of law.
 

 This Court does not review the Commissioner's determinations concerning resolutions of conflicting evidence, credibility of the witnesses, or the weight to be given their testimony. Rather, we review whether competent evidence in the whole record supports those findings. The order of the superior court, which affirmed the Commissioner's decision, is affirmed.
 
 It is so ordered.
 

 AFFIRMED.
 

 Judges ELMORE and STROUD concur.